IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 8, 2001

## STATE OF TENNESSEE v. JAMES L. ROBERSON, aka
## JAMES ROBINSON, aka "BLOOKIE"

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 6921     Joseph H. Walker, III, Judge**

_____

**No. W2000-02591-CCA-R3-CD  - Filed June 4, 2001**

_____

The defendant, James L. Roberson, was charged with attempted second degree murder for the repeated stabbing of a female acquaintance and was convicted of the offense, following a bench trial. He testified that he was under the influence of drugs at the time of the offense and could not remember what had happened. He appealed the conviction, arguing that, as the result of his mental state, the proof was insufficient to sustain the conviction. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which L. TERRY LAFFERTY, SR.J., joined. DAVID H. WELLES, J., not participating.

Gary F. Antrican, District Public Defender; Clifford K. McGown, Jr., Assistant District Public Defender (on appeal only); and Julie K. Pillow, Assistant District Public Defender, for the appellant, James L. Roberson.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlan, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Tracey A. Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant was convicted following a bench trial of attempted second degree murder, as the result of multiple stab wounds to the victim, who was a female acquaintance. He was sentenced as a Range II, multiple offender to fourteen years in the Department of Correction. He appealed the conviction, presenting the single issue on appeal of whether the proof was sufficient to sustain the conviction. Based upon our review, we affirm the judgment of the trial court.

# FACTS

The State's first witness, Anthony Lewis, testified that the defendant had been staying with him at his mobile home in Ripley, Tennessee, during the month of September 1999. On September 26-27, 1999, both the victim, Sherry Richardson, and the defendant were at the trailer, as was Lewis. He described the defendant's actions as they were watching television:

> Q. Okay. So y'all got – when you got to the – when you got to the trailer, what happened?
>
> A. When we got there, we just sat around for a minute, watching tv, so we went to the bedroom, then we come back out. He was sitting on the couch and then he got up and started – got to playing with her rough. She was telling him to leave her alone. He got to playing with her rough. Then he grabbed her around the neck, put a knife around her neck, and said, "I'll kill you, bitch. I'll kill you." Then some way he cut on her hand. That's when I jumped up and told him to get out – get his clothes and get out. So he went outside. When he went outside, Sherry asked me to take her home. So, when we got ready to go outside, I had forgot my keys in the house, so she went on outside to the car. So I went back in the house looking for my car keys. The next thing I know I heard her hollering.
>
> Q. Okay.
>
> A. Said he was stabbing her.
>
> Q. Okay.
>
> A. So, I ran back in the house and got the shotgun. That's when he jumped up off of her and ran to the other end of the trailer.
>
> Q. Let's slow down. Okay. When you got out there after she had yelled what she was yelling and you went back out there, what did you actually see happening?
>
> A. He was stabbing her.
>
> Q. Okay. Can you show us the motion that you saw happen?
>
> A. Like this.

-2-

Q. Okay.

A. But he was using the right hand.

Q. He was using his right hand, and how many times did you see him in the stabbing motion?

A. Couple of times.

Q. Okay. Did you hear him saying anything?

A. "I'm going to kill you, bitch."

Q. Okay. Did he say that more than one time?

A. Yes, ma'am.

Q. Okay. Did he say it just two times or more than two times?

A. Said it more than two times. All the time he was stabbing her, he was saying it.

Q. All the time he was stabbing her, he was saying, "I'm going to kill you, bitch."

A. Uh-huh.

After Lewis obtained a firearm, the defendant ran behind a car at the end of the trailer, but returned almost immediately, saying "Shoot me, Mother Fucker, shoot me." Lewis then took the victim to the hospital. When he later returned to his trailer, the defendant was in the woods nearby, "making funny noises" and "chunking railroad rocks" onto the trailer. After police officers arrived at the trailer, the defendant came running out of the woods, yelling, "Y'all Mother Fuckers can't catch me." However, this prediction proved to be inaccurate, for the officers, assisted by a tracking dog, did in fact later apprehend the defendant, wearing bloody clothes and with a bloody knife in his possession.

The victim, Sherry Richardson, testified that the defendant had first put the knife to her throat and "stuck" her on the finger as she tried to grab it. Lewis told the defendant "to get out," and the victim asked Lewis to drive her to her nearby home. She described what happened as they were leaving Lewis's trailer:

A. So as I was – as he went out the door, I was – I stayed in there for a minute, but after he went out the door, I went out the door

-3-

behind him and [Lewis] turned back to run to go look for his keys. When I went outside going to the car, he came out around the side of the house –

Q. Well, you've got to tell us – the Judge isn't sure who you're pointing to.

A. Okay. James Roberson.

Q. Okay. All right.

A. Came out of the side – James Roberson came out beside the trailer and just started stabbing me, said, "I'm going to kill you, Bitch."

Q. Uh-huh. And –

A. And stabbed –

Q. Go ahead. When he – Where did he stab you?

A. Right –

Q. You'll have to show the Judge. Okay.

A. Right there, right there, all in the back and right down here and the side of my head.

. . . .

Q. Okay. All right. So, do you know how many times it was that he stabbed you?

A. As they was telling me, I think it was ten.

Q. About ten times[?]

A. Yes, ma'am.

Q. All right. And when he was stabbing you, how many times was it that he was telling you –

A. Cussed all while he was doing it – all while he was stabbing me.

-4-

Q. All right. And he – the whole time he was telling you, "I'm
going to kill you, Bitch"?

A. Yes, ma'am. That's all he was saying.

Ms. Richardson testified that she was first taken to a local hospital and then airlifted to the Regional Medical Center in Memphis where she was hospitalized for ten days for a collapsed lung and other injuries as the result of the defendant's attack on her.

Cheryl Manns, keeper of the records for Baptist Hospital-Lauderdale County, utilizing hospital records, testified as to the victim's injuries:

> Physician's history and physical says, "26 year old black male (sic)
> brought to the ER with multiple stab wounds. Four left temple
> puncture wounds, puncture wound post chest times two, right side,
> right shoulder, and upper arm, left thumb almost totally severed,
> distal phalanges." And she received a chest tube – chest X ray which
> showed a pneumothorax, and she received a chest tube for that.

Ms. Manns further stated that the victim was transported to the Regional Medical Center in Memphis by helicopter for treatment of her injuries.

James Tony Jones, Lewis's neighbor, testified as to the defendant's throwing rocks at Lewis's trailer following the victim's being taken to the hospital and the defendant's returning to the trailer:

A. I was thinking like railroad rocks.

Q. Uh-huh. Okay. When these rocks were being thrown at the
trailer, did you hear anything? Did you hear something?

A. Not at that particular time, but when we finally come out, you
know, we kind of heard a strange sounding bird over in the trees.

Q. Uh-huh. Have you heard any birds like that before?

A. Not unless it was a dodo bird.

Q. Okay.

A. It wasn't no bird that exists, you know.

Sergeant Charles L. Smith of the Ripley Police Department testified that he was called to the hospital where the victim told him, "Blookie, the son-of-a-bitch, stabbed me." Smith knew "Blookie" to be the defendant, and he and other officers began a search for the defendant in the area around Lewis's trailer. Smith had a tracking dog brought in to aid in the search. A white trash bag with blood droppings was found in the area. While searching for the defendant, Smith heard someone yelling, "Who-d-d-y who – who-d-d-y who, I can see you." Smith also heard rocks being thrown onto Lewis's trailer.

Officer Rita Burnett Wright of the Ripley Police Department testified as to the defendant's behavior near Lewis's trailer as officers were searching for him and talking with Lewis:

> Q. Okay. And after you had talked with him, what was the plan of action?
>
> A. Well, while we were talking to him, we could hear some noises.
>
> Q. Okay. What kind of noises?
>
> A. It was some howling and like a growl, you know, bird – just all sorts of noises.
>
> Q. Okay. All right. Did you – other than these growling and these bird-type noises, did you hear anybody say anything? I mean, we heard Sergeant Smith talking about "Who-d-d-y who". Did you hear anything like that?
>
> A. Yes. While we were there, we were going to leave from there. Before we could get a chance to leave, Blookie ran past, I believe it's the driveway going out to the street, and he ran past and he hollered, "Who-d-d-y who – who-d-d-y who" and I believe he said, "Come and get me."
>
> Q. Okay. All right. So he actually ran in front of you; is that correct?
>
> A. Yes, ma'am.

Officer Wright also told of what she later observed after the defendant had been taken into custody:

> Q. Okay. All right. And when you rounded that corner and you saw that Tidwell and Baltimore were there with the defendant, what did you observe happen?

A. They were cuffing him and patting him down. He said, "I'm not going to run – I'm not going to run. I knew y'all was coming. I knew you was coming. You wouldn't have been able to catch me. I knew you was coming – I knew you was coming." And Baltimore told him he was under arrest. And while Tidwell was searching him, there was a case knife in the right front pocket and I believe it was some Buglar 'cause I remember it being blue. I don't know if it was actually Buglar, but it's a tobacco product in a blue – light blue bag. And that was in his other pocket.

Officer Donnell Baltimore of the Ripley Police Department testified as to his knowledge of the defendant's arrest:

Q. Okay. Let me just pinpoint you to the time that y'all are searching for him at the railroad tracks, did you actually see him?

A. Yes, ma'am.

Q. Okay. Explain that.

A. Okay. Myself and Ms. Wright was going to Keeley's Trailer Park in reference to the stabbing. As we started towards the trailer there, Mr. – Blookie – I call him Blookie – he started – he ran down through there hollering, "Who-d-d-y who – Who-d-d-y who." At that point, I exited the vehicle. Ms. Rita gets on the driver's side and she's trying to trail him and start chasing after him. He ran into a wooded area there and I lost him, and at that point, that's when we was [sic] trying to get the dogs there so we could sort of track.

Baltimore said that the defendant did not appear to be "strung out" on cocaine at the time of his arrest.

Jerry Holloway, a friend of the defendant's, testified that the defendant came to his apartment around 6:00 or 6:30 a.m. on September 27, 1999. The defendant told Holloway that he had stabbed the victim and asked Holloway to look at his hands, saying, "I got blood on them." The defendant also showed Holloway a knife. The police later arrested the defendant at Holloway's apartment.

The defendant was the only witness testifying in his behalf. He admitted to being at Lewis's trailer on the night of the incident, saying that he had been smoking crack cocaine earlier that evening. He said that as he, Lewis, and the victim were in the trailer, he saw the victim, who had a

-7-

child by both the defendant and Lewis, performing oral sex on Lewis, and he then snorted some powder cocaine and "snapped." He said that he did not know whether he had stabbed the victim, and his inability to recall resulted from "cocaine drugs." He said that the victim had used about two rocks of crack cocaine, which was supplied by Lewis, that evening.

Following this proof, the trial court found the defendant guilty as charged:

> The Court has listened to the proof in the matter and believes that the State has given ample proof and has carried its burden of showing that the defendant attempted to commit a knowing killing. Intoxication itself is not a defense to a prosecution for an offense when a person becomes voluntarily intoxicated and while in that condition commits an act which would be a crime if he were sober.

> In this case, the Court finds that the defendant is responsible for his conduct. The Court also can weigh that fact in regard to the culpable mental state and the Court finds that the defendant possessed the culpable mental state of knowing at the time of these events. The Court finds that the State has proven the defendant guilty beyond a reasonable doubt of attempted second degree murder and the Court finds the defendant guilty of that offense, a Class B felony.

## ANALYSIS

Where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial

-8-

> forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In addition to arguing that the evidence was not sufficient to sustain the conviction, the defendant argues that because of his alleged intoxication, as the result of ingesting illegal drugs prior to the stabbing, his actions were not "knowing." We will consider this claim.

In order to obtain a conviction for attempted second degree murder, the State was required to prove that the defendant acted with the intent to cause the knowing killing of the victim believing his conduct would cause the result without further conduct on his part. State v. Elder, 982 S.W.2d 871, 875 (Tenn. Crim. App. 1998); see Tenn. Code Ann. §§ 39-12-101(a)(2) and 39-13-210(a).

"Knowing" is defined as follows:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b).

Our supreme court explained in State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000), cert. denied, ___ U.S. ___, 121 S. Ct. 1202, 149 L. Ed. 2d 116 (2001), the proof required to sustain a conviction for second degree murder:

> An example of a result-of-conduct offense is second degree murder, which is defined as a "knowing killing of another." Tenn. Code Ann.§ 39-13-210(a)(1). In second degree murder, the result of the conduct is the sole element of the offense. The "nature of the conduct" that causes death or the manner in which one is killed is inconsequential under the second degree murder statute. The statute focuses purely on the result and punishes an actor who knowingly causes another's death. The intent to engage in conduct is not an explicit element of the state's case in second degree murder. Accordingly, a result-of-conduct crime does not require as an element

that an actor engage in a specified course of conduct to accomplish the specified result.

In this case, the proof is abundant to support the finding of the trial court that the defendant's stabbing of the victim was "knowing." Both the victim and Anthony Lewis testified that as the defendant was stabbing the victim, he was saying, "I'm going to kill you, bitch." He then ran as Lewis armed himself with a shotgun to stop the attack and eluded pursuers until after they had gotten a tracking dog. While some of his actions were somewhat peculiar, it is clear that his stabbing of the victim was "knowing," and the trial court's finding in this regard is fully supported by the evidence. Thus, this claim is without merit.

Concluding that the evidence is sufficient to sustain the conviction, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-10-